THE TREASURER, INC., Plaintiff,

v.

The PHILADELPHIA NATIONAL BANK and Mellon Bank, N.A., Defendants.

Civ. A. No. 88–567.

United States District Court,
D. New Jersey.

March 11, 1988.

Metzger & Shadyac by Eugene J. Metzger, Washington, D.C., Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, P.A. by Steven S. Radin, Newark, N.J., for plaintiff, THE TREASURER.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by John T. Dolan, Newark, N.J., Morgan, Lewis & Bockius by Gregory M. Harvey, Raymond T. Cullen, Philadelphia, Pa., for defendant, Philadelphia Nat. Bank.

Goldstein Till & Lite by Allyn Z. Lite, Newark, N.J., Reed Smith Shaw & McClay by Daniel I. Booker, Pittsburgh, Pa., for defendant, Mellon Bank, N.A.

## OPINION

POLITAN, District Judge.

This case comes before the Court on plaintiff's application for a temporary restraining order and a preliminary injunction. Plaintiff, The TREASURER, seeks to prevent Philadelphia National Bank [hereinafter PNB] from acquiring the assets of Mellon Bank's "CashStream" network and to ban enforcement of certain provisions of PNB's servicing agreements. TREASURER asserts numerous violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. As a private plaintiff in an antitrust suit, plaintiff relies on sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to bring this action. Defendants contend that the plaintiff has not asserted the requisite antitrust injury, and as such, it lacks standing to bring this antitrust suit. Defendant has brought a motion to dismiss for failure to state a claim upon which relief can granted. For the reasons outlined herein, plaintiff's application for a temporary restraining order and a preliminary injunction are denied, and defendant's motion to dismiss is granted.

The parties in this action operate regional Automated Teller Machine (ATM) networks which compete directly against each other in New Jersey. TREASURER operates primarily within New Jersey and has approximately 72 member financial institutions. It is the 25th largest regional ATM system in the United States in number of switched transactions and 29th largest in number of ATM's serviced. Defendant Philadelphia National Bank is a national banking association with its principal place of business in Philadelphia, Pennsylvania. PNB owns and operates an electronic funds transfer service commonly known as MAC, or Money Access Service. MAC does business primarily in the states of New Jersey, Delaware and Pennsylvania and is the largest regional ATM system in the United States in number of switched transactions and is the seventh largest system in number of ATM's serviced. MAC currently services approximately 80 financial institutions in New Jersey. Defendant Mellon Bank is a national banking association with its principal place of business in Pittsburgh, Pennsylvania. Mellon Bank owns and operates an ATM network known as CashStream. CashStream transacts business principally within the states of Pennsylvania, Delaware, New Jersey, West Virginia and Maryland. It is the fourth largest regional ATM system in the United States in number of switched transactions and is the thirteenth largest in number of ATM's serviced. Currently, CashStream services 193 financial institutions, 14 of which are in New Jersey. The primary area of competition between CashStream and MAC is located in Pennsylvania and Delaware, although the two also compete in New Jersey to a small extent.

In an agreement dated December 16, 1987, with a closing date of January 5, 1988, Mellon Bank and PNB undertook various obligations the effect of which was to accomplish a withdrawal by Mellon from the business of managing an ATM network.[1] It is this agreement which is the

---

1. The exact obligations are summarized in the preamble to the contract as follows: Mellon will agree, among other things, (1) to join and become a participant in the MAC network, (2) to terminate existing CashStream participation and license agreements and cease providing CashStream network services in the Defined Region, (3) to assist PhilaBank

subject of this lawsuit. TREASURER asserts in Count 1 of the complaint that the agreement is a horizontal contract and is a combination in restraint of trade. TREASURER alleges that it will suffer substantial injury to its business and property if the merger is not enjoined. Count 2 states that as a result of the merger, PNB will possess monopoly power in the regional ATM market. Counts 3 and 4 address themselves to the restrictive language in the MAC agreements which prohibit member institutions from using non-MAC access cards in MAC machines, thus prohibiting all financial institutions which do not belong to the MAC network from utilizing MAC locations and terminals.

They allow bank customers to do many banking transactions such as make withdrawals, deposits, loan payments, transfer funds between accounts and check balances 24 hours a day without the need to see a live teller. Many financial institutions have developed proprietary, or "in house" ATM systems which served only their own branches. ATM networks, such as MAC and TREASURER, were developed to link various financial institutions so that bank customers could use the ATM of a competitor bank as long as the two banks were members of the same network. If an institution did not have the computer capacity to power or "drive" the ATM, the regional ATM network could supply the software to drive or process the institution's system.

The ATMs in a shared network are linked *via* interstate communication lines to a central computer referred to as a "switch" which operates as a clearing facility for all transactions initiated at the ATMs. This way, customers of one bank can access an ATM of another bank provided both banks belong to the same network. On a larger scale, national networks known as The PLUS System and CIRRUS evolved.

These national networks linked up with regional networks and provided bank customers with national access to account information. Membership in a regional network is a useful selling device for financial institutions to their customers. It is therefore desirable even for banks with the ability to drive their own ATMs to join regional networks so that their customers can access other banks' ATMs. These banks (called intercept processors) have the ability to either process the transaction itself or relay it to the appropriate regional or national network.

There are different transaction charges for different types of ATM services and for different levels of interconnection between ATM systems. The network switch charges the card-issuing financial institution a "processing fee" for the provision of transaction clearing services and ATM support. In the case of a transaction entered at an ATM not owned by the card-issuing financial institution (called a foreign transaction), the network switch charges an additional fee called an "interchange fee" to the institution which owns the ATM at which the transaction was initiated. Because all members of an ATM network are charged by the switch operator based upon the same fee schedule, they generally do not compete against each other within the network on the basis of price. The price competition is generated between networks and is one factor a financial institution considers when deciding which network to join.

Whereas price may be a factor a financial institution will look at when deciding which network to join, the principal competitive advantage of any ATM network is the number of ATMs utilized by the system. Financial institutions prefer a large system because it increases the potential for inter-

---

in soliciting and persuading current CashStream participants in the Defined Region to become participants in the MAC network and in otherwise managing the conversion of the network, and (4) with respect to regional ATM network services, to endorse exclusively MAC ATM network services in the Defined Region for a period of at least five years subject to the exceptions set forth in Section 6(h) hereof;

and PhilaBank will agree among other things, (1) to operate and vigorously promote the consolidated network under the MAC name, and (2) to pay Mellon for its agreements and undertakings and for PhilaBank's opportunity to earn service fees in the future from current CashStream participants that as a result of the consolidation elect to join MAC network.

bank transactions and therefore, more profit from interchange fees. Consumers generally prefer a system with a large number of ATMs because of the greater convenience offered by such a system. In addition, because ATM systems entail substantial capital and operating costs, a high volume of transactions is necessary to make the machine cost effective. An ATM network must maintain a sufficient number of ATMs in order to compete for customers and to generate sufficient transactions to be cost effective.

There has been much confusion regarding the pricing structure of MAC. TREASURER has indicated at several points in the proceeding that MAC's fees are higher than the industry average.[2] The testimony has revealed that MAC charges a price which included many services that TREASURER's fees do not—a bundled charge as compared to an unbundled one. MAC's charges include switching services, daily reports, conveyance or the transmission or physical delivery of those transactions to both the ATM owners as well as the card issuers, and advertising and promotional activities which MAC engages in to increase consumer awareness. Banks which affiliate with CashStream are assessed an additional charge for services such as advertising. Currently, MAC's average switch fee is fourteen cents with a range of

five cents on the low end to thirty cents on the high end. TREASURER's fees range from five to fifteen cents per transaction.

In addition to its frontal attack on the PNB–Cashstream agreement, TREASURER also seeks to have this Court strike the restrictive language in the MAC servicing agreements which prohibit financial institutions from allowing another network to access their ATMs. TREASURER allows its members to belong to more than one network so that it is possible for one bank to belong to both TREASURER and CashStream. MAC forbids its member institutions from permitting its customers to use non-MAC cards in a MAC ATM. This restriction, for all intents and purposes, imposes a "MAC only" obligation on its member institutions. It is exceedingly rare that a financial institution will issue two cards or provide two machines.[3]

TREASURER competes directly with MAC in New Jersey. CashStream competes directly with MAC in Pennsylvania, Delaware and in some parts of New Jersey. For the past several years, TREASURER and CashStream have shared ATMs in New Jersey. However, as a result of the MAC–CashStream consolidation, financial institutions which have affiliated with both CashStream and TREASURER are now being forced to choose between MAC and some other network.[4] MAC's restrictive cove-

2. In plaintiff's Memorandum of Points and Authorities in Support of Motion for Temporary Restraining Order and Preliminary Injunction, TREASURER asserts that MAC's alleged higher prices "will constitute an irresistible siren song, luring all banks not already MAC members into the MAC system, thus destroying TREASURER's economic viability." It is clear, however, that a competitor cannot suffer antitrust injury from its rival's charging higher prices. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). There, the Court repeatedly stressed that competitors have only to gain from their rivals' higher pricing schemes. *Id.* at 582–583, 106 S.Ct. at 1353–1354.

3. MAC has tried to assert that there are financial institutions which offer the services of both MAC and CashStream to their customers. The testimony of Douglas Anderson reveals that there are two financial institutions which issue both MAC and CashStream cards. One of those institutions does not have any ATMs however.

It merely issues cards for the benefit of its customers. The other institution has MAC machines and only allows MAC cards in those machines. The CashStream cards were given out to be used in CashStream ATMs at other locations.

4. For example, in 1983, National Bank and Trust Company of Gloucester County (National Bank) entered into an agreement with PNB pursuant to which PNB agreed to provide National Bank with MAC and related ATM support service. The initial term of the agreement was three years, with automatic renewals from year to year unless terminated by written notice at least 180 days prior to the end of the then current term (the standard MAC agreement). PNB's service agreement with National Bank prohibits National Bank from also participating in competing regional ATM systems.

In September of 1985, National Bank was acquired by First Fidelity Bank, N.A., South Jersey. First Fidelity is a member of TREASURER. First Fidelity then advised PNB that it

nant is acting to prohibit banks from accessing both the TREASURER and MAC in the same ATM. TREASURER is complaining because it feels that the majority of CashStream users will choose to affiliate with MAC. Specifically, whereas the MAC–CashStream consolidation agreement only binds those ATMs owned by Mellon Bank, TREASURER is concerned that once all the Mellon ATMs are converted to MAC-only ATMs, the other financial institutions currently in the CashStream network will elect to join MAC because of the large ATM base that MAC possesses in the market. Since Banks cannot use both MAC and TREASURER in the same machine, TREASURER is further distressed that those banks who are now part of Cash-Stream/TREASURER will be precluded from continuing the affiliation with TREASURER if the proprietary bank elects to go with MAC and TREASURER will be denied access to all of these machines.

■ Private plaintiffs have standing to sue for violations of the antitrust laws exclusively under sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26. Under section 4, "any person *who shall be injured* in his business or property *by reason of anything forbidden in the antitrust laws* may sue therefor in any district court of the United States ..." 15 U.S.C. § 15. (Emphasis supplied). Section 16 grants the plaintiff standing to sue for injunctive relief. It states "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States ... *against threat-*

*ened loss or damage by a violation of the antitrust laws,* ... when and under the same conditions and principles as injunctive relief against *threatened conduct that will cause loss or damage* is granted by court of equity...." 15 U.S.C. § 26. (Emphasis supplied).

These remedies are only available to a certain limited group of plaintiffs. A plaintiff must allege and prove "antitrust injury" in order to fall within the narrow class of persons who can benefit from these laws. The analysis differs from that which is undertaken when the United States is the plaintiff and a general public right of action is asserted.[5] Here plaintiff's injury must be tied to an antitrust injury. This is made clear by an analysis of recent Supreme Court decisions.

In *Brunswick Corp. v. Pueblo Bowl–A-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), the Supreme Court sets out what has come to be the current standard in antitrust analysis in private party litigation. In *Brunswick,* the Supreme Court considered whether antitrust damages were available under section 4 where the sole injury alleged was the continued existence of a competitor's business, which denied plaintiff the anticipated profits it would have derived had the competitor's bowling centers failed. Plaintiff sued for damages purportedly arising from defendant's acquisition of a number of bowling centers which were experiencing financial difficulty. These bowling centers directly competed with plaintiff and would have been eliminated from the marketplace had

---

wished to integrate National Bank's seven ATMs into the TREASURER system without affecting its concurrent participation in MAC. To do this, First Fidelity proposed to issue TREASURER/MAC cards and designate its First Fidelity ATMs as MAC/TREASURER. This would enable National Bank's customers to access all TREASURER and MAC ATMs. Conversely all TREASURER and MAC card holders would be able to access National Bank's ATMs. There are no technological or operational obstacles to the shared use of ATMs by Mac and TREASURER. PNB flatly refused this type of arrangement. By letter dated September 8, 1986, Ms. Bonnie Hill, then a Vice President of PNB, advised First Fidelity that PNB would not allow National Bank to be a member of both TREASURER and MAC. Ms. Hill's letter stated:

[We] would like to reiterate that our Access Policies contained in Section IV, Policies and Rules of Conduct of our Operating Manual clearly state that only MAC cards and PLUS SYSTEM cards may currently be used for access at MAC ATMs. We have not and will not allow the use of TREASURER cards in MAC ATMs even if the TREASURER cards are issued by the same institution (also a MAC participant) to its customers. We have also always maintained that MAC cards may not be used in other competitive systems' ATMs. Therefore, MAC cards issued by your institution may not be used in your ATMs designated as TREASURER ATMs.

5. *See e.g. Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).

defendant not acquired them. Plaintiff asserted that this purchase violated section 4 of the Clayton Act because it would deprive plaintiff of the profit increases expected to result from the failure of the competitor's business. Noting that all merger transactions cause some economic dislocation but that Congress chose to forbid only those with anticompetitive effects, the Supreme Court concluded that section 4 does not provide a remedy for all economic problems resulting to private plaintiffs even from illegal mergers, but only for:

> ... *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation.

*Brunswick, supra,* 429 U.S. at 489, 97 S.Ct. at 697 (emphasis in original). Citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962), the *Brunswick* Court reaffirmed that the antitrust laws protect "competition not competitors," and concluded that the plaintiff was actually complaining of the enhanced competition to result from the challenged merger. Accordingly, the alleged "losses" did not amount to an antitrust injury within the meaning of section 4.

In *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), the Supreme Court further elaborated on the requirement of the necessity for showing an antitrust injury in private party anti-trust litigation. The complaint must allege more that just "a causal connection between an antitrust violation and harm to the [plaintiff]. ... [T]he mere fact that the claim is literally encompassed by the Clayton Act does not end the inquiry." *Id.* at 537, 103 S.Ct. at 908. Among the factors that must be weighed in determining antitrust standing are the directness or indirectness of the injury, the court's ability to keep trial of the claim within manageable limits, and the nature of the injury. *Id.* at 538–545, 103

S.Ct. at 908–912. *See also Alberta Gas Chemicals Ltd. v. E.I. Du Pont De Nemours and Co.,* 826 F.2d 1235, 1240 (3d Cir.1987).

In *Cargill, Inc. v. Monfort of Colorado, Inc.,* 479 U.S. 104, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986), the Supreme Court speaking through Justice Brennan extended its requirement of antitrust injury to cases brought under section 16 of the Clayton Act. In *Cargill,* the nation's fifth largest beef packer sued under section 16 to enjoin the merger between the second and third largest beef packers. It alleged that the merger would result in unlawful concentration of economic power in the relevant markets and erode plaintiff's ability to compete. Plaintiff contended that after the merger, the defendant could increase its market share by reducing prices to cost or slightly above cost and then recoup its losses after its competitors had disappeared. Plaintiff's claimed injuries were the threats of reduced profits and its being driven out of the business. *Cargill,* 107 S.Ct. at 488.

Finding first that injunctive relief under section 16, like damages under section 4, was available only to plaintiffs who proved injury of the type the antitrust laws were designed to prevent, the Court then held that the loss of profits resulting from a non-predatory price reduction did not qualify as antitrust injury. The Court also held that price competition, far from being an injury of the type the antitrust laws were designed to prevent, is pro-competitive.

The plaintiff's second claimed injury, exclusion from the market by post-merger predatory pricing, was also rejected because the plaintiff had failed to allege that the defendant would act with predatory intent or that it would engage in below-cost pricing after the merger. The Court also held that, in any event, the facts did not show that predation could be successful in that the alleged predator would have to absorb the market shares of its rivals. If not, sufficient demand would remain for the product even at higher prices, and the competitors would not be driven from the market. Finally, the Court held that the

facts failed to show any barriers to market entry, and that without such barriers, it would be impossible for an entity with a substantial market share to maintain super-competitive pricing.

Based on this analysis of the record and because the plaintiff alleged only loss or damage due to increased competitiveness, rather than any threat of antitrust injury, the *Cargill* Court found that the plaintiff had no standing to pursue any action under section 16.

More recently, the Third Circuit had occasion to rely on the standards set forth in *Brunswick* and *Cargill* to determine that plaintiff had failed to assert cognizable antitrust claims. In *Alberta Gas Chemicals Ltd. v. E.I. Du Pont De Nemours and Co.,* 826 F.2d 1235 (3d Cir.1987), a methanol producer (Alberta Gas) challenged a competitor's (Du Pont) acquisition of another corporation (Conoco) whose merger led to cancellation of the acquired company's plans to produce methanol. The production of methanol would have been preceded by large scale purchases from the plaintiff. The Court held, *inter alia,* that plaintiff's alleged loss of anticipated sales did not constitute antitrust injury. In *Alberta,* it was clear that the plaintiff suffered an injury. As a direct result of the merger, Conoco cancelled its methanol project, thereby causing Alberta to lose money from the increased sale of methanol. But the Court stressed that this type of injury was not the type that the antitrust laws were designed to prevent. "Alberta's horizontal injuries do not flow 'from that which makes the defendants' acts unlawful'." *Id.* at 1241, quoting *Brunswick,* 429 U.S. at 489, 97 S.Ct. at 697. "Alberta's alleged losses were neither connected with, nor resulted from Du Pont's market power in the methanol-producing industry. That is clear because the same harm would have occurred had any acquiror decided to curtail Conoco's production and marketing plans." *Id.*

In the instant case, the issue before us is twofold: whether the TREASURER has asserted losses or injuries which may be properly called antitrust injury; and if it

has, examine the merger to see if indeed the proposed merger violates the Sherman Act.

In Count one of its complaint, plaintiff asserts that the defendants have entered into a horizontal contract and combination in restraint of trade and commerce in the provision of regional ATM services. As a result of the merger, plaintiff will suffer substantial injury to its business and property. Count two alleges that PNB is attempting to monopolize the market in regional ATM services.

 It is clear that under the standards set out in *Brunswick, Associated General Contractors, Cargill,* and *Alberta Gas,* plaintiff has not demonstrated any antitrust injury. Quite the contrary is true. There is substantial evidence that what the consolidation agreement does is present to the TREASURER opportunities to compete for additional business in geographic and product areas in which it currently does not compete.

As the markets are arranged now, TREASURER does not compete in the Pennsylvania or Delaware regions. TREASURER operates in New Jersey and has 514 ATMs which are affiliated with it. With the sale of the CashStream network, the banks that were part of CashStream are now free to decide which network to join. TREASURER had and still has the right to go into the Pennsylvania and Delaware markets and actively solicit banks for their ATM business. The MAC–CashStream contract only bound Mellon Bank to convert its ATMs over to MAC. Mellon Bank possesses 650 ATMs or roughly one-third of the ATMs currently in the CashStream system. The agreement between PNB and Mellon calls for Mellon to aid in the recruitment of CashStream customers to the MAC system. According to Cash-Stream officials, the CashStream contracts are only assignable if over 50 percent of the participating banks choose to assign them. Further, the assignments may be terminated on 90 days notice.

TREASURER is free to compete with PNB in soliciting former CashStream members to join TREASURER. TREASURER,

however, has a rather passive marketing system. It does not actively solicit business. MAC, on the other hand, is very aggressively seeking business. PNB has one vice president and a staff of four assistant vice presidents whose job it is to call on banks and convince them to sign up with MAC. "We actively pursue any customer that is not in MAC." Testimony of Bonnie Hill, Senior Vice President and Manager of MAC, Tr. 251. MAC has also spent 8.5 million dollars over the last five years in the promotion and advertising of the MAC brand. What TREASURER seeks to do is have this Court assist it in its marketing plans. Rather than try to recruit CashStream members on its own, TREASURER seeks to have this Court prevent the merger from happening, thereby causing former CashStream members to align with TREASURER.

This Court is not, nor can it be, under any circumstances, a tool to promote the interest of one competitor over another under the guise of declaring illegal a proposed merger. Competition is to be encouraged, not stifled. The object of the anti-trust legislation is to *foster* and *insure* full and free competition in the marketplace. A declaration of illegality of the agreement at the case at bar would have quite the opposite effect.

Moreover, it should be specifically noted that the TREASURER, as well as MAC, sought to acquire CashStream. MAC was the successful negotiator. It is indeed difficult to support a result that this Court should undo that which the free flow of competition between the very parties to this litigation created. The bidding and competition between MAC and TREASURER to purchase CashStream was free of any taint of illegality, unfair dealings or overreaching. CashStream chose MAC over TREASURER. This Court will not interfere in a transaction that intense free market competition produced.

TREASURER also objects to the fact that MAC is offering inducements to banks that choose MAC as their regional network affiliate. MAC has set aside what it terms a "significant fund" to defray the costs associated with transfer and the termination of the right to use the CashStream logo. Furthermore, PNB has agreed to waive all MAC membership and conversion charges provided the banks choose to affiliate by April 7, 1988. To qualify for full conversion assistance, CashStream members must sign a MAC agreement on or before April 7, 1988. Signing members will receive cash support of up to $1500 per ATM and one dollar per access card, provided conversion is completed within six months of becoming operational in MAC. If conversion is completed within one year of becoming operational in MAC, these subsidies drop to $750 and fifty cents, respectively. There are no subsidies if a MAC agreement is signed subsequent to April 5, 1988, or if conversion is not completed within one year of becoming operational in MAC.

I can find nothing illegal in having increased competition for CashStream's accounts. The effect of CashStream's announcement that it was leaving the market created a opening which TREASURER has not, through its promotional programs, been able, or meaningfully sought to penetrate. TREASURER complains to this Court about the lack of competition when the facts demonstrate that it is TREASURER who is not competing with MAC, rather than MAC doing anything to illegally restrain competition. Since the announcement of the PNB–Mellon agreement, CashStream affiliated banks were actively solicited for membership in the MAC network. Since January 7, 1988, MAC and CashStream personnel have met personally with approximately 70% of the CashStream affiliates, and have sponsored three seminars (in Pittsburgh, Harrisburg and Philadelphia) to explain the consolidation, which were attended by representatives of virtually all CashStream affiliated institutions. In the testimony of Mr. Barrett, Chairman of the Board of TREASURER, he stated that TREASURER has attempted to solicit CashStream banks. He testified that Treasurer sent literature to the CashStream affiliated banks advertising that the TREASURER price structure was more attractive; that it has a more democratic struc-

ture that is not dominated by a single institution; and that its quality of service is equal to, if not better than, MAC's. Aside from this one letter and other minor activities, TREASURER has not aggressively sought out CashStream affiliated banks. It has offered no monetary inducements, nor has it agreed to waive any fees. The mere fact that PNB has actively engaged in an aggressive marketing campaign to solicit potential customers does not make its actions illegal. TREASURER is free to engage in any marketing strategy it chooses in order to attract those CashStream financial institutions. If CashStream banks elect to go with MAC, it is not this Court's role to direct them otherwise. TREASURER has the opportunity to compete and that it all the antitrust laws were meant to protect. Antitrust laws were designed to protect competition, not competitors. *Brunswick,* 429 U.S. at 488, 97 S.Ct. at 697 (citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 1521, 8 L.Ed.2d 510 (1962)).

The record in this case is exhaustive. The Court received voluminous briefs on the matter from plaintiff and both defendants. On February 10 and 11, 1988, the Court took evidence and heard arguments of counsel on plaintiff's motion for a preliminary injunction. The Court heard testimony of six witnesses and received documentary exhibits. The Court also has five certifications (labelled declarations), and one affidavit in connection with the testimony from an expert witness presented by PNB.

What is fatally lacking from all of plaintiff's submissions is any real indication of antitrust injury. Plaintiff's allegations of injury are vaguely characterized in the complaint as follows:

The effect of the acquisition by PNB of CashStream may be substantially to lessen competition or to tend to create a monopoly in the market and line of commerce for shared regional ATM service in the Pennsylvania, Delaware, New Jersey, three state, and eastern and central Pennsylvania markets. As a direct result of an acquisition of CashStream by PNB, plaintiff will suffer substantial injury to its business and property. As a further direct result of an acquisition of CashStream by PNB, plaintiff and the public are threatened with irreparable loss or damage for which plaintiff has no adequate remedy at law. [Verified Complaint §§ 45–47].

\* \* \* \* \* \*

As a direct result of PNB's unlawful conduct, plaintiff will suffer substantial injury to its business and property. As a further direct result of PNB's unlawful conduct, plaintiff and the public are threatened with irreparable loss or damage for which plaintiff has no adequate remedy at law. [Verified Complaint §§ 53, 54].

The record is replete with argumentative predictions of "substantial injury" to the TREASURER if this transaction is allowed to proceed. The Court, time and time again, questioned the parties as to what the alleged antitrust injury was, and how it was defined. Notwithstanding the barefaced predictions, what is missing from the record before me is any concrete testimony or proffers of proof of the specific nature of this alleged injury. More precisely, plaintiff has failed to prove that the harm that will come to it constitutes antitrust injury; that is, injury of the sort the antitrust laws were designed to remedy. *Cargill,* 107 S.Ct. 484, 491 (1986).

Consumers or financial institutions would suffer anticompetitive injury if the effect of the consolidation agreement were to permit PNB effectively to increase the price of ATM switching services to noncompetitive levels. No other potential injury to consumers or financial institutions is suggested by the plaintiff or anything developed in the record. There is no basis to predict that the consolidation agreement will permit PNB to charge non-competitive prices to MAC network ATM financial institutions for switching services. Financial institutions are free agents in joining the MAC network. Typically, they can cancel the MAC agreement on 180 days notice. If PNB charges non-competitive prices, MAC members (including Mellon Bank) are free

to join together to form their own network or to invite other ATM network operators to bid for their switching business.[6] All or any part of the services essential to operation of an ATM network, including trade names, switching and driving, can be provided by suppliers to unaffiliated financial institutions of automated data processing services. Among the existing or potential suppliers of automated data processing services to unaffiliated financial institutions are large banks, existing regional and national ATM network operators and others. The potential entry of such suppliers limits the ability of ATM network operators to charge non-competitive prices. Further, while the two national networks, PLUS and CIRRUS cannot fully replace the regional networks,[7] they can and do provide some degree of competition for the bank customer who merely desires a convenient location to withdraw cash.[8] The pricing structure of PLUS and CIRRUS therefore acts as another form of cap or competitive inhibitor upon the pricing structure of MAC. MAC is not free to charge super-non-competitive prices because banks with the capacity to drive their own ATMs will withdraw from MAC and join a national network directly. There are also regional networks such as the "New York Cash Exchange," (also known as NYCE) or the OWL network or JEANIE network of West Virginia with the capacity and desire to expand into the New Jersey, Pennsylvania, Delaware markets. It can be reasonably inferred that they will do so if MAC raises its prices to such a degree so as to make it profitable for these other networks to compete.

In further support of its preliminary injunction, TREASURER has also furnished what it believes to be the proper definition of the relevant markets. Plaintiff cites statistics to the effect that after the consolidation, PNB would control 99 percent of the market in Pennsylvania, 97 percent of the market in Delaware, 69 percent of the market in New Jersey, 91 percent of the market in the Pennsylvania, Delaware, New Jersey three-state area, and 99 percent of the market in the eastern and central Pennsylvania markets. Prior to the proposed affiliation with CashStream, MAC operated primarily in Pennsylvania, New Jersey and Delaware. As of December 31, 1987, MAC serviced approximately 1,538 ATMs in Pennsylvania, representing 52 percent of the shared regional ATM market (as measured by number of affiliated ATMs in service) in that state. This figure includes 472 MAC West ATMs in western Pennsylvania serviced pursuant to a license agreement with PNB by Tri-State Network Association, Inc., a Pittsburgh based consortium of Dollar Bank, Equibank, First Seneca Bank and Pittsburgh National Bank. In New Jersey MAC serviced approximately 113 ATMs representing 52 percent of that market.

CashStream operated primarily in Pennsylvania, New Jersey, and Delaware, Maryland and West Virginia. As of December 31, 1987 CashStream serviced approximately 1,385 ATMs in Pennsylvania representing 47 percent of the shared regional ATM network market in that state. In New Jersey, CashStream serviced approximately 49 ATMs representing 3.9 percent of that market. In Delaware, CashStream serviced approximately 97 ATMs representing 45 percent of that market. Because TREASURER allows financial institutions to operate more than one network on an ATM, CashStream is a second source on 151 ATMs which are serviced by TREASURER. These banks will now have to choose the network with which to affiliate. PNB will not permit the banks to access another network's card in its ATMs.

Initially, it must be repeated that plaintiff in this case is a private party and not the United States government. Even if,

---

**6.** Most ATM networks are joint ventures of financial institutions.

**7.** The national networks primarily act as cash machines. For the most part, customers cannot make deposits or make loan payments through national networks.

**8.** There was also testimony to the fact that the national networks are more expensive because the transaction must pass through several layers of processing.

arguendo, this Court accepts plaintiff's definition of the relevant market and concludes that MAC will control almost all of the Pennsylvania and Delaware markets, plaintiff has still not demonstrated that it has been injured in any way. Plaintiff does not now compete in Pennsylvania or Delaware. Its ability to enter the Pennsylvania and Delaware would be equally as great if MAC controlled the market as if MAC–CashStream controlled the market. In fact, it is enhanced as CashStream affiliated banks are free to affiliate with MAC, TREASURER, or any other system.

Most importantly, this Court disagrees with plaintiff's narrow reading of the relevant market. Plaintiff simply ignores the realities of the current ATM market. This Court holds that the relevant product market cannot be confined to just those networks that service ATMs currently in existence. The relevant product market is electronic data processing to all ATMs *plus* all of those institutions which have unaffiliated ATM systems and those institutions which do not currently have ATMs but have the capacity to install them and utilize market technology to its fullest. The networks themselves do not own the ATMs. It is the financial institutions which own the ATMs. In the case of MAC, PNB owns a central computer and "switch" which links up the ATMs of other financial institutions. PNB, however, as a financial institution also owns some ATMs.

The financial industry is undergoing a major and dramatic transition. Banking lines are becoming less clear. Specifically, bank customers can now get cash from bank accounts without going to the bank. That is the function of an ATM. ATMs are now being installed in retail stores to enable customers to access funds from their account without the necessity of writing a check. This benefits the store owner because he gets the cash at the time of the purchase and does not have to wait for the check to clear. It also eliminates the risk that the customer will give the proprietor a bad check. Further, Plaintiff's calculations

assume an improperly narrow market that ignores potential entrants and that consists only of regional ATM networks presently operating in New Jersey, Pennsylvania, and Delaware. Other regional networks, such as NYCE or the OWL network can enter the market and establish bases.

Plaintiffs statistics ignore the large number of unaffiliated ATMs that are open territory for competition. PNB has presented testimony that, based on the deposits of affiliated and unaffiliated financial institutions in New Jersey, the market is held as follows: MAC controls 33.5 percent; TREASURER controls 26.8 percent; CashStream controls 5.2 percent and 34.4 percent of the market is not affiliated with any market. Moreover, the testimony demonstrated that a large portion of MAC's marketing and promotional endeavors is aimed at currently unaffiliated ATMs. TREASURER is free to, and does compete for these ATMs as well. Proof positive of the "hot and heavy" competition and TREASURER's opportunity to freely compete, and, in fact, outcompete MAC for new customers is the recent, post-hearing revelation that City Federal Savings, a previously unaffiliated bank in New Jersey with 110 ATMs at 79 locations, has just aligned with TREASURER.

Lastly, plaintiff seeks to have this Court strike the restrictive language in the MAC contracts which forbid member institutions from allowing other network cards to access MAC designated machines. In Count three of the complaint, plaintiff challenges under section one of the Sherman Act PNB's practice of requiring financial institutions who purchase its MAC services to preclude access to MAC branded ATMs by non-MAC cards. This action is not illegal *per se*, but rather requires analysis under the "rule of reason." *Chicago Board of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).[9] In Count four of the complaint, plaintiff challenges the same practice under section 2 of the Sherman Act, alleging it to be in fur-

---

**9.** Even Mr. Metzger, Attorney for plaintiff, at the hearing admitted that he was not arguing per se illegality.

therance of an attempt to monopolize or monopolization.

To prove monopolization or an attempt to monopolize under section 2, a plaintiff must demonstrate: (a) possession of monopoly power or a dangerous probability of the acquisition of such power, and (b) a specific intent to monopolize or willful acquisition or maintenance or monopoly power. *United States v. Grinnell Corporation,* 384 U.S. 563, 570–571, 86 S.Ct. 1698, 1703–1704, 16 L.Ed.2d 778 (1966); *Pennsylvania Dental Association v. Medical Service Association of Pennsylvania,* 745 F.2d 248, 260 (3d Cir.1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2021, 85 L.Ed.2d 303 (1985). "In proving specific intent, a mere intention to prevail over rivals or improve market position is insufficient. Even an intent to perform acts that can be objectively viewed as tending toward the acquisition of monopoly power is insufficient, unless it also appears that the acts were not 'predominantly motivated by legitimate business aims.'" *Pennsylvania,* 745 F.2d at 260 (citations omitted).

The access provisions were instituted by PNB in 1979, at the outset of the MAC system. They were and are intended to structure PNB's distribution of network services, to provide a return to PNB for its prior and continuing activities in developing, maintaining and promoting the MAC network, and to prevent free riding by competitors on PNB's efforts. Such purposes are legitimate business aims under the antitrust laws. *See e.g. The Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). Additionally, since the restrictions were in effect since the inception of the MAC network, it cannot be said that they were put in effect to "unreasonably restrain interbrand competition."

MAC entered the New Jersey market in 1980. At that time, it had zero percent of the market, and no ATMs in New Jersey were operated by financial institutions affiliated with MAC. The MAC contracts contained the same restrictive language prohibiting banks from accessing more than MAC cards in a MAC ATM. There-

fore, it cannot be reasonably argued that the restrictive language was monopolistic in intent. The restriction is merely part and parcel of an obviously successful, comprehensive marketing strategy.

Because plaintiff has failed to make the showing of actual antitrust injury as required by § 16 of the Clayton Act, it does not have standing to bring this lawsuit. Therefore, we need not decide the issue of whether the merger violated the Sherman Act. Whatever harm may or may not occur to TREASURER by reason of the consolidation of MAC and CashStream is simply insufficient to state a claim of injury cognizable under the antitrust laws. Accordingly, plaintiff's application for a preliminary injunction is DENIED and defendant's motion for dismissal must be GRANTED.

An appropriate order will be entered.