MONEY STATION, INC., Petitioner,

v.

BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, Respondent,

Banc One Corporation, et al., Intervenors.

Nos. 95–1182, 95–1243.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 1996.

Decided April 23, 1996.

---

Ernest Gellhorn argued the cause, for petitioner. Stephen J. Landes, John A. Herfort, Leonard H. Hersh, Richard S. Rhodes, Chicago, IL, and Paul Blankenstein, Washington, DC, were on the briefs.

Douglas B. Jordan, Senior Counsel, argued the cause, for respondent, with whom James V. Mattingly, Jr., General Counsel, Richard M. Ashton, Associate General Counsel and Katherine H. Wheatley, Assistant General Counsel, Washington, DC, were on the brief.

Peter Buscemi argued the cause, for intervenors, with whom Stephen P. Mahinka, Washington, DC, was on the brief.

Before: EDWARDS, Chief Judge, WALD and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting Opinion filed by Chief Judge HARRY T. EDWARDS.

WALD, Circuit Judge:

Petitioner Money Station, Inc. seeks review of an order of the Federal Reserve Board ("Board"), allowing a joint venture known as Electronic Payment Services ("EPS"), which operates the nation's largest Automatic Teller Machine ("ATM") network, to acquire the assets of a smaller ATM network operated by National City Corporation.

In its written submissions to the Board, Money Station expressed concern that the proposed transaction would allow EPS's network of ATMs (known as the MAC network) to further increase its dominant market position in Pennsylvania, Kentucky, and Ohio, weakening smaller ATM networks like Money Station, and precluding smaller networks from themselves purchasing National City's assets or combining with National City in an effort to create a viable large competitor to MAC. Money Station also protested that EPS had failed to show—as required by the Bank Holding Company Act ("BHC Act" or "Act"), 12 U.S.C. § 1841, *et seq.*—that there would be sufficient public benefits from this transaction to outweigh the possible adverse effects. Finally, Money Station requested that the Board hold an evidentiary hearing to address the disputed issues it had raised—such as its claim that this transaction would not in fact accelerate the development of new consumer banking products.

The Board, however, rejected Money Station's request for a hearing, and approved the transaction, finding that the adverse effects from this transaction were not significant and were outweighed by the potential benefits to the public. We hold that the Board's finding of no significant adverse effects, even if supportable, did not permit the Board to approve the transaction without an adequate evaluation and explanation of the public benefits that would be likely to arise from this transaction. We find not only that the Board failed to provide such an explanation, but that it was required to hold an evidentiary hearing to resolve disputes raised by Money Station about the putative public benefits. Accordingly, we grant Money Station's petition for review and vacate the Board's order.

## I. BACKGROUND

The question here is whether the Federal Reserve Board properly approved a proposal by a group of bank holding companies to acquire the ATM-related assets of another bank holding company. The acquiring companies—BancOne Corp., CoreStates Financial Corp., PNC Bank Corp., and KeyCorp—are large banking organizations based in Pennsylvania and Ohio, who are the four joint venturers in Electronic Payment Services, a company which operates a network of ATMs known as MAC. Under the applicants' proposal, EPS would acquire the ATM-related assets of National City Corporation, which operates an ATM network under the name of MoneyCenter, and National City would in turn become the fifth equity owner of EPS. As part of the proposed transaction, EPS would receive approximately $74 million in cash.

Before the proposed transaction, EPS's MAC network was the largest ATM network in the nation by transaction volume, handling nearly 100 million transactions a month through more than 13,000 ATM machines.[1] As part of its network business, MAC provided all of the services essential to ATM operations, such as operating the computer links which connect the machines, processing the transactions, and providing a clearinghouse service for reporting the transactions to financial institutions. The company whose assets EPS proposed to acquire—National City—ran a smaller ATM network known as MoneyCenter, which operated about 900 ATM machines, and provided a less comprehensive range of services.

MAC serviced not only the banks of its corporate parents but many other banks throughout the Mideast region. Although MAC's customers were free not to join a network, and could instead operate their own ATM machines (as most banks did in the early days of ATMs), banks felt pressure to join a network like MAC,

> in order to give their depositors ubiquitous access to their accounts. While a bank can deploy its own ATMs, the advantage to a shared ATM network is that a bank's depositors will be able to use ATMs at many more locations than one bank alone could practically support.... A bank—particularly a small bank, thrift or credit union with one or only a few offices—would be at

---

1. EPS currently operates 31% of the ATMs in Ohio. If the proposed transaction were approved, and National City's MoneyCenter ATMs were combined with MAC's, the resulting venture would operate 45% of Ohio's ATM machines. *See* App. 267; 331–32.

a competitive disadvantage if it could not offer its depositors access to many conveniently located ATMs.

*United States v. Electronic Payment Servs., Inc.,* Proposed Final Judgment and Competitive Impact Statement, 59 Fed.Reg. 24,711, 24,713 (1994) ("Proposed Final Judgment").[2]

Two months before EPS's application was filed, the Department of Justice ("DOJ"), in a separate action, had filed a complaint against EPS, alleging that through its MAC network it unlawfully "maintained a monopoly in access to regional networks in ... Pennsylvania and ... substantial portions of Ohio," in violation of the Sherman Act. *See* Proposed Final Judgment, 59 Fed.Reg. at 24,712. The complaint alleged that EPS was maintaining an illegal tying arrangement by requiring the members of its network to buy their ATM processing services from EPS instead of third-party processors, and was in effect prohibiting its members from affiliating with competing networks.[3] Ultimately, the Justice Department and EPS entered into a consent decree, whereby EPS agreed to end its practice of requiring the banks which participate in its MAC network to also purchase ATM processing services from EPS, and also agreed to allow the members of its network to become members of networks which compete with MAC. *See United States v. Electronic Payment Servs., Inc.,* 1994–2 Trade Cases (CCH) ¶ 70,796, 1994 WL 730003 (D.Del.1994).

In the meantime, the Board published a notice of EPS's proposed acquisition of National City's MoneyCenter network in the Federal Register, 59 Fed.Reg. 44,149 (1994), and Money Station and other protestants filed comments in opposition. Money Station alleged that the transaction would result in significant anticompetitive effects in the Pennsylvania–Ohio–Kentucky region, and specifically claimed that:

> [i]f the current applications are approved, the already high barriers to entry for effective competition will be at prohibitive levels because no other network—whether MSI or any new network—will be able to attain the critical mass of ATMs necessary to support a network that could realistically exercise a competitive restraint on EPS' pricing and related practices. The many hundreds of ATMs controlled by NCC and Mellon will not be available to another network, and neither NCC nor Mellon— both of which have experience running successful branded networks involving other banks—will be available to establish (or assist in establishing) networks competitive with MAC. This condition is not altered by the fact that the recently announced consent decree in the *EPS* case opens up opportunities for third-party processors. Once MAC locks up virtually all the ATMs in the Pennsylvania–Ohio–Kentucky area as customers of its branded network through the transaction with Mellon and NCC, there will be an insufficient number of banks to create a "critical mass" necessary for a new network to be formed by a processor.[4]

2. A good overview of the ATM market is provided in *The Treasurer, Inc. v. Philadelphia Nat'l Bank,* 682 F.Supp. 269, 271 (D.N.J.), *aff'd mem.,* 853 F.2d 921 (3d Cir.1988), which explained:
   > The ATMs in a shared network are linked *via* interstate communication lines to a central computer referred to as a "switch" which operates as a clearing facility for all transactions initiated at the ATMs. This way, customers of one bank can access an ATM of another bank provided both banks belong to the same network.... There are different transaction charges for different types of ATM services and for different levels of interconnection between ATM systems. The network switch charges the card-issuing financial institution a "processing fee" for the provision of transaction clearing services and ATM support. In the case of a transaction entered at an ATM not owned by the card-issuing financial institution ... the

network switch charges an additional fee called an "interchange fee" to the institution which owns the ATM at which the transaction was initiated.

3. According to the DOJ, "[u]ntil 1992, MAC generally did not permit its customers to participate in rival ATM networks while also participating in MAC. While the rule against multiple affiliations was formally dropped in 1992, MAC engages in practices that make it impractical for many participating banks—particularly smaller banks—to belong to a rival network while belonging to MAC." Proposed Final Judgment, 59 Fed.Reg. at 24,713.

4. Originally, EPS had also proposed to acquire the network services division of Mellon Bank, and Mellon would have become an equity owner of EPS, but the Mellon application was withdrawn in January 1995.

Comment of Money Station, *reprinted in* App. 201–02. In making these allegations, Money Station echoed many of the findings of the Department of Justice, which in its action against EPS had alleged:

> The MAC network is the dominant ATM network in the affected states [of Pennsylvania, New Jersey, Delaware, West Virginia and New Hampshire]. . . . Nearly all banks in the affected states believe they have no choice but to participate in the MAC network. Banks in the affected states affiliate with MAC because MAC is the only ATM network that provides ubiquitous ATM network access throughout all or most of the contiguous affected states. . . . Banks in the affected states often obtain ATM network access from MAC even though defendant's switching and processing fees, and other costs of doing business with MAC, are higher than those charged by other networks and by independent processors.

Proposed Final Judgment, 59 Fed.Reg. at 24,713.

In addition to raising concerns about the adverse effects from the transaction, Money Station claimed that the transaction was not likely to result in benefits to the public which would outweigh the possible adverse effects, and requested that the Board hold an evidentiary hearing on the proposal. In particular, Money Station questioned whether the products identified by the applicants—the development of at-home banking services and stored value cards—would really yield net public benefits, since these products were already under development by National City and other companies, and there was no evidence that this transaction would *accelerate* their development. As Money Station put it: "The public benefits that the applicants claim will flow from the transaction do not meet the standards of objectivity and specificity established in prior Board decisions and could be achieved in less anti-competitive ways." Comment of Money Station, *reprinted in* App. 203. The Board accepted a number of written submissions from Money Station, and members of the Board's staff met once with Money Station and the applicants,

but the Board refused to hold an evidentiary hearing.

On March 1, 1995, the Board issued an order approving the transaction, and five days later issued an explanatory statement, finding that "this proposal would not result in significant adverse effects on the competitive considerations required to be reviewed under the section 4(c)(8) standard." Board Statement at 16, *reprinted in* App. 648. In addition, the Board found that the "balance of the public interest factors that ... [we must] consider under section 4(c)(8) of the BHC Act is favorable, and consistent with the approval of this proposal." *Id.* at 21, *reprinted in* App. 653. Finally, the Board rejected Money Station's request for a hearing, finding that "Protestant's request disputes the weight accorded to, and the conclusions that may be drawn from, all the facts of record, and does not identify disputed issues of fact that are material to the Board's decision." *Id.* at 23–24, *reprinted in* App. 655–56. Board Vice Chairman Blinder dissented, finding that

> it seems undeniable that allowing National City's ATM network to be merged into the MAC network would result in *some* adverse effect on competition. Therefore, to approve this transaction, the Board must find that there are sufficient public benefits to outweigh the loss of competition. The application, per se, demonstrates no such benefits to the *public* in my view.

Dissenting Statement at 1, *reprinted in* App. 662 (emphasis in original).

## II. Discussion

The Bank Holding Company Act of 1956 reflects a policy judgment by Congress that bank holding companies should generally not acquire nonbanking enterprises. *See* Bank Holding Company Act, 12 U.S.C. § 1841 *et seq.;* S.Rep. No. 1095, 84th Cong., 1st Sess. 1 (1956) ("bank holding companies ought not to manage or control nonbanking assets having no close relationship to banking"); *Connecticut Bankers Ass'n v. Board of Governors,* 627 F.2d 245, 249 (D.C.Cir.1980) ("Congress heeded the frequently voiced fear that banks could wield their economic power in such a way as to dominate other elements of the

private sector."). In the Act, however, Congress made an exception to this general rule in those cases where

> performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices.

BHC Act § 4(c)(8), 12 U.S.C. § 1843(c)(8). The Federal Reserve Board is the agency entrusted by Congress with the initial responsibility for conducting this balancing test and determining whether the reasonably expected public benefits from a proposed transaction outweigh the possible adverse effects.[5] On review, "[t]he findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive." 12 U.S.C. § 1848.

■ Importantly, under this statutory framework, it is not enough for a bank holding company to show an absence of potential adverse effects from a proposed transaction. Rather, the burden is on the holding company to affirmatively show that public benefits from the transaction could reasonably be expected, and would outweigh the possible adverse effects. *See Citicorp v. Board of Governors*, 589 F.2d 1182, 1190 (2d Cir.) ("legislative history indicates the burden is on the applicant affirmatively to establish the net public benefit of its proposal"), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2860, 61 L.Ed.2d 297 (1979). Put another way, it is not enough that a proposed transaction would do no harm; rather, it must be likely to do some public good.

## A.  *Adverse Effects*

Although we grant Money Station's petition for review principally on the grounds that the Board's public benefits investigation and explanation were inadequate, we do note concern with the Board's treatment of the adverse effects that might arise from this transaction, such as the fact that National City's MoneyCenter network would no longer compete with MAC, and—perhaps more importantly—that the MoneyCenter assets could no longer be combined with another smaller network in order to create a viable competitor to MAC.[6]

In addressing the issue of MAC's size and dominant market position, the Board basically assumed away the issue by focusing narrowly on the marginal effects of this transaction rather than on the entire competitive situation in the ATM market. Thus, instead of meeting head-on the Act's proscription on an "undue concentration of resources," the Board merely said:

> It has been recognized that MAC has a significant position in the ATM network access services in certain states in the Mideast region. However, the significant position of a regional ATM network is not, standing alone, contrary to the public interest. Network externalities, such as the economies of ubiquity, tend to promote the consolidation of regional ATM networks. As a result, in various geographic areas, like the Mideast region, dominant ATM networks have been emerging throughout the EFT industry. One recent study indicates that the ten largest regional networks now account for 80 percent of all regional ATM transactions in the United States. In this light, the Board believes that, as a result of economic and market structure conditions, regions are likely to have one dominant ATM network.

In other words, the Board said: "It doesn't matter if MAC is big, or if it gets even bigger, because the economics of the situation naturally favor bigness." While this approach conveniently allowed the Board to dismiss any concerns about monopoly concentration, it certainly cannot be deemed a

---

5.  The Board must also determine whether the type of activity the bank holding company wishes to engage in is "closely related" to banking—an issue not in dispute here.

6.  As the Board noted, National City had attempted just such a venture a few years before. Though that venture ultimately fell through, the Board never explained why a future venture could not be successful.

conclusion that no adverse effects would arise from this transaction.[7]

We are troubled, however, by the Board's implication that through a slow process of accretion, a network like MAC can establish a large and potentially harmful monopoly position, provided that none of the company's individual acquisitions standing by itself is too large. To treat a company's size and market position before a proposed transaction as *irrelevant* in determining whether there are potential adverse effects from a transaction is scarcely consistent with the Act's goals of "increas[ing] competition" and preventing an "undue concentration of resources," nor does it appear consistent with the Board's own precedents of looking at the degree of monopolization of markets in analyzing transactions. *See, e.g., Citicorp,* 69 Fed.Res.Bull. 648, 649 (1983) (finding that "the elimination of probable future competition is not generally significant *where the market is unconcentrated* ") (emphasis added); *Deutsche Bank AG,* 67 Fed.Res.Bull. 449, 451 n. 7 (1981) (discussing possible adverse effect that "the firm resulting from such a joint venture might be unduly strengthened relative to its competitors").

The Board's analysis here of the possible adverse consequences, however, is barely salvaged by the fact that despite its disclaimers, the Board did acknowledge and reflect some concern about MAC's near-monopoly position (although that concern was reflected in carefully couched language). Thus, though it found that the adverse effects arising from this transaction would not be "significant," the Board took pains not to rule out the possibility there would be *some* adverse effects. *See, e.g.,* Board Statement

at 12, *reprinted in* App. 644 ("[t]he facts of the record do not support the view that National City would be *particularly likely* to enter any relevant product market in the Mideast region independently, or through another joint venture in competition with MAC....") (emphasis supplied); Board Statement at 19, *reprinted in* App. 651 ("proposal is not likely to result in any *significant* unfair competition") (emphasis supplied); *see also* Dissenting Statement of Vice Chairman Blinder, *reprinted in* App. 662 (there would be a "modest reduction in competition ... it seems undeniable that allowing National City's ATM network to be merged into the MAC network would result in *some* adverse effect on competition").

■ As discussed above, under the BHC Act, even had the Board found no adverse effects, it would still have been required to find some reasonable expectation of public benefits. But given that the Board did find some adverse effects, it was required to find more than a speculative or scant public benefit.[8]

### B. *Public Benefits*

■ We find, however, that the Board's public benefits findings were in fact too speculative, and were not based on substantial evidence in the record. Those findings, in their entirety, were:

> Both National City and KeyCorp propose to make significant cash investments to purchase or increase their respective equity positions in the operations of EPS, including the MAC network. The capital infusions resulting from these investments should enable EPS to continue and to ex-

---

7. To the contrary, all the evidence suggests that in ATM networks, size is critical to the success of potential market competitors. As the court described it in *The Treasurer:*

> Whereas price may be a factor a financial institution will look at when deciding which network to join, the principal competitive advantage of any ATM network is the number of ATMs utilized by the system. Financial institutions prefer a large system because it increases the potential for interbank transactions and therefore, more profit from interchange fees. Consumers generally prefer a system with a large number of ATMs because of the greater

convenience offered by such a system. In addition, because ATM systems entail substantial capital and operating costs, a high volume of transactions is necessary to make the machine cost effective.

682 F.Supp. at 272.

8. According to our dissenting colleague, the Board found the potential adverse effects amounted to "virtually nothing" or at best a "negligible" amount. *See* Dissenting Opinion ("Diss. op.") at 1145. But, as the Board's own language quoted in the text above shows, this is not an altogether accurate reading of the Board's findings.

pand its research and development efforts, and thereby improve its ability to develop and offer to the public innovative electronic banking and fund transfer products, such as stored value cards and home banking services.

Protestants also dispute generally EPS's claims that public benefits would result from this proposal and, in particular, the claim that this proposal would result in innovative electronic banking products and services. While the Board recognizes that some of these products are already offered in some form, the Board believes that the availability of these products throughout a broad-based ATM network such as MAC represents some public benefit. Similarly, while the Board believes that EPS already has made substantial progress in developing these products without the contemplated capital infusions, the enhanced research and development capabilities generated by these investments should improve EPS's ability to introduce these products sooner, to ensure the quality of the products being offered, and to present the products to a broad customer base. The Board also believes that the broader ownership base of EPS should improve the probability of success for new products by increasing the number of financial institutions and consumers that are likely to use these products in earlier stages of development.

Board Statement at 20–21, *reprinted in* App. 652–53. Essentially, the Board identified two public benefits—stored value cards and home banking services—and two ways this transaction would help develop these products more quickly: (1) the capital infusion from National City and KeyCorp into EPS would potentially enhance development; and (2) the broader ownership base would potentially expand the market (and thus the likelihood of success) for the new products.

■ We have previously recognized that the Board's "reasoned judgments" with respect to potential public benefits are entitled to "some deference." *Connecticut Bankers Ass'n,* 627 F.2d at 254 (D.C.Cir.1980). But it is equally true that the Board, like other agencies, must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Here, we do not find such a "satisfactory explanation."

Although the Board suggested that the new cash input would be used to increase Research & Development activities, in reality KeyCorp had represented that "Cash received from KeyCorp and National City as part of the Proposed Transaction will be used to *reduce* [ ] *debts* and for *general working capital* purposes." App. 65 (emphasis added). Neither the Board nor our dissenting colleague cites to any firm statement by EPS, National City, or KeyCorp suggesting that any of the approximately $74 million in cash EPS would receive as part of this transaction would be used to increase Research & Development activities. Moreover, although the Board acknowledged that substantial progress had *already been made* in developing these products, it speculated that the capital infusion would improve EPS's ability to introduce the products sooner—though it never identified how much sooner, nor explained how increased capital would in any way speed up the development process.

Nor was it clear why EPS could not get the capital to develop these products in the absence of this transaction. If these products were really commercially viable and would benefit the public, there is no reason to suspect that EPS (or other companies) would have any difficulty in bringing them to market as quickly as possible. The record is devoid of any evidence that EPS faced obstacles in obtaining capital in the market, and thus that it was unlikely that these products would fail to be developed in the absence of this transaction.[9]

9. This transaction stands in contrast to cases like *Connecticut Bankers,* where it was the *operation* of the business after the transaction which would produce the public benefit. In *Connecticut Bankers,* a bank wished to establish a subsidiary to sell insurance to its banking customers, providing them with extra *convenience* because they could get their loans and insurance in one location. *See* 627 F.2d at 247. Such a public benefit, unlike the putative benefit here, could not be

In the past, however, the Board has looked to whether the claimed public benefits were likely to be obtained absent the transaction. For example, in *Chase Manhattan Corp.*, 60 Fed.Res.Bull. 142 (1974), Chase Manhattan Bank had applied to acquire all the shares of Dial Financial Corporation, and cited as a public benefit its plans to open 150 new offices in the three years following the transaction, as well as plans to expand the financial services offered by Dial, such as small business loans, farm loans, and mortgages. Rejecting these claimed public benefits as inadequate, the Board said:

> The record does not show to what extent such services are presently competitively unavailable in the markets served by Dial.... Dial, which has demonstrated its ability to respond to competitive challenges, would appear likely to so diversify irrespective of its affiliation with Applicant.... [I]rrespective of the proposed affiliation, it appears that Dial would plan to open a substantial number of new offices each year.... Applicant's proposal is not considered substantially different in effect from the policy implicit in action taken already by Dial. While the proposed acquisition would clearly lead to some public benefits, there is little indication that the above or other claimed benefits are not likely to be obtained in the absence of the acquisition.

*Id.* at 145. Here, however, rather than following this approach, the Board failed to analyze in any meaningful way the extent to which at-home banking or stored value cards are already available in the marketplace or the chances that EPS would have brought these products to market in the absence of the transaction. If the Board had a good reason for departing here from its past practice of looking at what would occur absent the transaction, it never chose to reveal it.[10]

### C. Failure to Hold Evidentiary Hearing

■ The weakness of the Board's public benefit findings points up what we see as the fatal flaw in this process—the Board's failure to hold an evidentiary hearing on the disputed issue of the public benefits arising from this proposed transaction. Under section 4(c)(8), and the Board's own regulations, the Board is required to hold a hearing where "there are disputed issues of material fact that cannot be resolved in some other manner." 12 C.F.R. § 225.23(f)(2).

We have held that if the Board wishes to deny a hearing, it "carries a heavy burden of justification ... the agency must show that the parties could gain nothing thereby, because they disputed none of the material facts on which the agency's decision could rest." *Independent Bankers Ass'n of Geor-*

---

obtained merely by an infusion of capital, but instead would result only from the operation of the new business.

**10.** One commentator has noted:

> The Board's overall analysis of efficiencies in these cases seems lighthanded and superficial. The approach taken by the FTC and division and the courts require the parties to demonstrate that ... there are no less anticompetitive means for achieving the efficiencies and these benefits will be passed on to consumers ... the argument—accepted by the Board—that [National City] would make cash infusions that would enable EPS to continue and expand its research and development efforts would not pass this test because there are a number of alternative sources of revenue to fund such research.

David A. Balto, *Payment Systems and Antitrust: Can the Opportunities for Network Competition be Recognized?*, FEDERAL RESERVE BANK OF ST. LOUIS REVIEW, Nov./Dec. 1995, at 22.

Our dissenting colleague's suggestion that *Chase Manhattan Corp.* is somehow not "appo-

site" on the issue of whether the Board should consider the *net* public benefits of proposed transactions (*i.e.*, comparing the public benefits that are likely to occur after the transaction with those that would occur without the transaction), Diss. op. at 1146, does not convince us. In the case cited by the dissent, *Bank of New York Co.*, 80 Fed.Res.Bull. 1107 (1994), the Board found that the transaction would *reduce* costs, *increase* transaction volume, and *increase* convenience—all findings which implicitly compared the post-transaction situation with the *status quo ante*. *Id.* at 1109. Thus, contrary to the dissent, we find nothing in *Bank of New York* to suggest that the Board has abandoned its practice of comparing what would obtain after the transaction with the situation before the transaction in determining—as the Act requires—whether the transaction can reasonably be expected to produce benefits to the public such as "*greater* convenience, *increased* competition, or *gains* in efficiency." 12 U.S.C. § 1843(c)(8) (emphasis supplied). Moreover, there is no suggestion in *Bank of New York* that a hearing was ever requested.

*gia v. Board of Governors*, 516 F.2d 1206, 1220 (D.C.Cir.1975).[11] As we said in *Connecticut Bankers Ass'n*:

> The Board cannot lightly dismiss a protestant's request for a hearing. Where a contest exists with respect to a material fact, the Board must conduct a full evidentiary hearing on that issue. Moreover, the burden of making the requisite showing to trigger the hearing requirement is not great.... The protestant must make a minimal showing that material facts are in dispute, thereby demonstrating that "an 'inquiry in depth' is appropriate."

627 F.2d at 251 (quoting *Independent Bankers Ass'n of Georgia*, 516 F.2d at 1220 n. 57). Here, the record reflects that Money Station went well beyond the "minimal showing" it was required to make.

In its submissions to the Board, Money Station pointed out that this transaction would not necessarily increase Research & Development activities because "NCC Mellon and EPS can readily engage in *ad hoc* research projects" without the proposed transaction. App. 368. Money Station further noted that EPS had never responded to the Board's questions as to the "*amount* of the efficiencies that would arise from the transaction." App. 427. In addition, Money Station pointed out that the new products that would allegedly be brought into the market were not "new or distinctive, and, with respect to which, there is no basis for

concluding that any contribution by EPS—as opposed to many other entities—would be distinctive." App. 429. To the contrary, MSI listed many instances in which the products to be developed by EPS had already been developed by other companies, App. 429–30, a statement never rebutted by EPS. Although our dissenting colleague implies that these many statements were "bald or conclusory," *see* Diss. op. at 1146, he does not, in our opinion, explain why.[12]

An evidentiary hearing was precisely what was required to address this dispute as to the existence and extent of the potential public benefits. At a hearing, officials from EPS would have been required to testify as to what use they planned to put the increased capital. They would have had to specify how much they planned to increase Research & Development, how much more quickly product development would be accelerated, and to explain just how a broader ownership base for EPS would enhance development—all questions which went unanswered in this truncated process.

Since the use to which the capital would be put—and its consequences—was both *material* and in *dispute*, a hearing was required. This court has held that "the question of the intent of the applicant under section 4(c)(8) is essentially an adjudicative issue." *Independent Bankers Ass'n of Georgia*, 516 F.2d at 1224.[13] And in similar circumstances, other

11. *See also id.* at 1220 n. 57 ("[D]enial of a statutorily mandated hearing is justified only in exceptional circumstances. A petitioner need not make detailed factual allegations in order to meet the requirement ... [h]e need only show that an 'inquiry in depth' is appropriate.").

12. Our colleague's suggestion that an evidentiary hearing constitutes an "extraordinary" remedy, Diss. op. at 1138, 1146, strikes us as curious in light of this court's previous statement that it is the *denial* of a hearing which is "justified only in exceptional circumstances." *Independent Bankers Ass'n of Georgia*, 516 F.2d at 1220 n. 57. At any rate, it is Congress, not the courts, which has provided that decisions under Section 4(c)(8) shall be made "after due notice and opportunity for hearing," 12 U.S.C. § 1843(c)(8).

While the dissent cites Board counsel's statement at oral argument that "only two or three" hearings have been conducted since 1980 (a statement, incidentally, for which there is no support in the record), Diss. op. at 1146, this

statement, even if true, tells us little about the Board's own practice given that we do not know how many *contested* applications under 4(c)(8) the Board has considered in that period and in how many of those proceedings a hearing was *requested*. In any case, we find our colleague's suggestion that the Board's past decisions not to hold hearings (whether justified or not) somehow entitled the Board to deny a hearing here—when the extent of the public benefits was in serious dispute—itself extraordinary.

13. The Court in *American Bancorporation* explained that:

> Adjudicative facts are the facts about the parties and their activities, businesses, and properties. Adjudicative facts usually answer the questions of who did what, when, how, why, with what *motive or intent*; adjudicative facts are roughly the kind of facts that go to a jury in a jury case.

509 F.2d at 36–37 (quoting 1 K. Davis, Administrative Law Treatise § 7.02 at 413 (1958)) (emphasis added).

courts have held that the Board was required to hold a hearing. *See American Bancorp., Inc. v. Board of Governors,* 509 F.2d 29, 37 (8th Cir.1974) (finding Board improperly denied a hearing where protestants had, *inter alia,* raised question about "to what uses any capital infusion by [acquiring company] into [acquired company] would be put"). Given the skeletal nature of EPS's public benefit claims, and this court's clear statement that the Board has a heavy burden in justifying the denial of a hearing, the Board's summary rejection of Money Station's hearing request was contrary to law.

### III. CONCLUSION

Given the uncertainty surrounding the public benefits that would be likely to emerge from this transaction, the Board was required, at a minimum, to hold an evidentiary hearing. Accordingly, Money Station's petition for review is granted, and the order of the Board is

*Vacated.*

HARRY T. EDWARDS, Chief Judge, dissenting:

In March 1995, the Board of Governors of the Federal Reserve System ("Board") approved applications filed by several bank holding companies requesting that National City Corporation ("NCC") be permitted to transfer the services associated with its automated teller machine ("ATM") network, MoneyCenter, to Electronic Payment Services, Inc. ("EPS"), which owns and operates the "MAC" ATM network. In exchange for the MoneyCenter network and a payment of roughly $42,000,000, NCC was to acquire an equity interest in EPS. Money Station, Inc. ("MSI"), the owner and operator of a rival ATM network, challenges the Board's action, asserting that the Board failed to consider relevant facts, improperly construed the requirements of section 4 of the Bank Holding Company Act ("BHC Act"), 12 U.S.C. § 1843 (1994), misapplied binding precedent, and unfairly denied MSI a hearing. Contrary to MSI's assertions and the majority's holding, I find that the Board's order is amply justified and supported by substantial evidence, and that there is also no ground upon which

to disturb the Board's determination that further hearings are not warranted. Therefore, I respectfully dissent.

The result here is a wonderful windfall for Money Station (and its attorneys), who now get to continue this litigation over nothing. Money Station's main complaint seems to be that it has fared poorly in the open market, not because of any illegal actions by its competitors but because those who purchase the services at issue apparently prefer Money Station's competitors. Neither the Board nor the Antitrust Division of the Department of Justice found merit in Money Station's claims. Yet, this court—based on nothing—now offers an extraordinary remedy: an evidentiary hearing to allow Money Station to whine over its disfavored position in the market. This is not a result that is intended under the BHC Act, and the remedy given today is one that is almost never afforded complainants under the Act. I trust that the Board will say *even more* on this next go-around to be done with this litigation. Nonetheless, I dissent because I feel strongly that this case sets a bad precedent in an area in which this court has little to offer as against the expert judgments of the Board (to which we should have deferred).

### I. BACKGROUND

#### A. *The ATM Industry*

ATM networks use computers to link ATMs to each other and to provide a central repository for customer account information. The earliest ATM networks were "proprietary" networks linked only to the ATMs of a single financial institution. As the use of ATMs grew, shared networks evolved, through which various financial institutions could join together to handle transactions moving between two or more proprietary networks.

The operation of shared networks requires three major types of services: (1) ATM processing services, so that each financial institution can keep its terminals running and route transactions through its system; (2) network switching services, allowing one financial institution's ATM to access an account held at another financial institution;

and (3) other network access services, including the implementation of network operating rules and the development of network business. A financial institution can provide some or all of these services for itself, or it can obtain these services separately or in combination by purchasing them from an existing network, another financial institution, or a third-party vendor.

## B. The History of EPS

EPS was formed in 1992 when four bank holding companies received approval from the Federal Reserve Banks of Philadelphia and Cleveland to contribute their respective ATM-related businesses to a combined venture in exchange for capital stock of the new enterprise.[1] The resulting ATM network is known as MAC, and its operations are conducted through two subsidiaries of EPS. The MAC network was designed to operate as a profit-making venture that would offer a package of network services to financial institution customers, including processing, switching, and access services. EPS marketing efforts on behalf of the MAC network have included promotion of the MAC name, active recruitment of financial institution customers, and research and development to expand the variety of transactions that can be conducted through the network. After the creation of EPS, the MAC network contained approximately 13,000 ATMs, making it the largest ATM network in the country by transaction volume. As of June 1994, when the applications at issue in this case were filed with the Board, the MAC network operated in 25 states and had a major presence in 13 states.[2]

In 1994, the Department of Justice ("DOJ") reviewed the MAC network's operating rules in response to allegations that EPS unlawfully "maintained a monopoly in access to regional [ATM] networks" in the Mideast, including Pennsylvania, New Jersey, Delaware, West Virginia, New Hampshire, and "substantial portions of" Ohio, in violation of section 2 of the Sherman Act, 15 U.S.C. § 2 (1994). See United States v. Electronic Payment Servs., Inc., Proposed Final Judgment and Competitive Impact Statement, 59 Fed.Reg. 24,711, 24,712 (1994). This investigation culminated in the entry of a consent decree between EPS and DOJ, which is to be effective until the year 2004. See United States v. Electronic Payment Servs., Inc., 1994–2 Trade Cases (CCH) ¶ 70,796, 1994 WL 730003 (D.Del.1994) ("Consent Decree"), reprinted in J.A. 307–13.

Under the Consent Decree, EPS may not directly or indirectly condition access to the MAC ATM network on the purchase of ATM processing services from EPS. Thus, EPS is generally required to permit any third-party processor that meets reasonable and non-discriminatory technical, financial, and operating criteria to process ATM transactions for financial institutions participating in the MAC network. EPS also may not discriminate against ATM networks that choose third-party processors. In addition, the Consent Decree mandates that EPS take no action to prevent MAC-customer financial institutions from placing more than one logo on their ATMs; similarly, EPS agreed that it would not restrict the placement of more than one logo on ATM cards issued by financial institutions in a five-state area (Delaware, Indiana, New Jersey, Ohio, and Pennsylvania).

In the Competitive Impact Statement issued with the Consent Decree, DOJ stated that the Consent Decree would increase competition for regional network access and reduce barriers for ATM processing. Proposed Final Judgment, 59 Fed.Reg. at 24,720. DOJ published the Consent Decree and related comments it had received, as required by 15 U.S.C. § 16(b)–(h) (1994). See United States v. Electronic Payment Serv.,

---

1. The original investors in EPS were Banc One Corporation ("Banc One"), CoreStates Financial Corporation ("CoreStates"), PNC Bank Corp., previously known as PNC Financial Corp. ("PNC"), and KeyCorp, formerly Society Corporation.

2. EPS had a major presence in Delaware, Indiana, Kentucky, Maryland, Michigan, New Hampshire, New Jersey, New York, Ohio, Pennsylvania, Tennessee, Virginia, and West Virginia. See Application to the Board of Governors by KeyCorp at Exhibit K (June 17, 1994) ("KeyCorp Application"), reprinted in Joint Appendix ("J.A.") 15, 82.

*Inc.,* Public Comments on Proposed Final Judgment and Response of United States, 59 Fed.Reg. 44,757–80 (1994), *reprinted in* J.A. 156–79. MSI filed comments stating that proper implementation of the Consent Decree would "open up competition" for network access and ATM processing, but sought to extend the Consent Decree to other parts of EPS's business. *Id.* at 44,765, *reprinted in* J.A. 164. DOJ rejected this proposal and stated that its investigation was limited to the ATM industry. After reviewing the comments it received, DOJ moved to have the Consent Decree entered without modification.

### C. *The Proposed Transaction Between EPS and NCC*

In late 1993, EPS and NCC proposed a reorganization of their business structures. NCC sought to transfer its MoneyCenter ATM network and approximately $42,000,000 to EPS in exchange for an ownership interest in EPS. Under this plan, NCC's MoneyCenter network services would be consolidated with EPS's existing MAC network.

NCC, and the other bank holding companies involved in EPS, filed applications with the Board in June 1994 pursuant to section 4(c)(8) of the BHC Act, 12 U.S.C. § 1843(c)(8) (1994), seeking its approval of the proposed transactions.[3] In response to the applications, the Board invited public comment. MSI submitted comments arguing that the proposed transaction would increase concentration in the ATM industry; enhance EPS's dominant position to the point of creating a monopoly; eliminate NCC as a competitor; increase barriers to entry; and not provide any public benefits. *See* Comment of MSI in Opposition to Section 4(c)(8) Applications of Banc One, et al. ("MSI Comment"), (Sept. 16, 1994), *reprinted in* J.A. 187–243.

The applicants responded to these and other comments. *See* Response of Applicants

(Sept. 30, 1994), *reprinted in* J.A. 273–97. MSI replied by reiterating many of its initial points, and raising what it considered to be questions of fact sufficient to warrant an evidentiary hearing before the Board. *See* Reply Comment of MSI (Oct. 21, 1994), *reprinted in* J.A. 316–74. A number of exchanges of comments, replies, and responses followed. The Antitrust Division of DOJ also investigated the proposed transaction to determine its competitive effect, but ultimately decided not to submit any comments to the Board and took no further action with respect to the proposed transaction.

On December 12, 1994, the Board's staff conducted a meeting to air objections to the proposed EPS/NCC transaction. Parties objecting to the transaction submitted a detailed proposed agenda identifying the concerns expressed by MSI, such as the alleged anticompetitive effect of the contemplated transaction on existing ATM service providers and the claimed likelihood that it would bar new providers from entering the ATM network market. *See* Proposed Agenda, *reprinted in* J.A. 501. Several people attended the meeting, including representatives of EPS, NCC, and MSI. At the end of the meeting, the Board's staff invited additional submissions, and MSI submitted further information to the Board reiterating its arguments against the transaction.

### D. *The Board's Order*

On March 1, 1995, the Board issued an order approving the transactions. *See* Order Approving Notices to Acquire Certain Data Processing Assets, Federal Reserve System (Mar. 1, 1995) ("Order"), *reprinted in* J.A. 627–29. The Board's statement of reasons followed on March 6, 1995. *See* Statement by the Board of Governors of the Federal Reserve System Regarding Notices to Acquire Certain Data Processing Assets, Federal Reserve System (Mar. 6, 1995) ("Statement"), *reprinted in* J.A. 633–62.[4]

---

**3.** The BHC Act prohibits bank holding companies from owning or controlling a non-bank company or engaging in activities other than banking or bank management. *See* 12 U.S.C. § 1843(a) (1994). Section 4(c)(8) provides an exception for activities that the Board finds are closely related

to banking or bank management and that will be expected to produce benefits to the public sufficient to outweigh any adverse effects. *See id.* § 1843(c)(8).

**4.** The Statement was adopted by five of the Board's six participating members. One mem-

The Board approved the applications because it concluded that the proposed transaction "would not result in significant adverse effects on the competitive considerations required to be reviewed under the section 4(c)(8) standard," Statement at 16, *reprinted in* J.A. 648, and found the proposal "not likely to result in any significant unfair competition, conflicts of interests, unsound banking practices, or other adverse effects," *id.* at 19, *reprinted in* J.A. 651. In making this determination, the Board relied on the record and comments before it, and also took into consideration the effect of the Consent Decree and the fact that DOJ had decided not to oppose the EPS/NCC transaction.

In the Statement, the Board explained that it had focused its analysis on MAC's Mideast region (western Pennsylvania, Ohio, Indiana, Kentucky, and West Virginia) in light of allegations that the proposed transaction "would result in significant anticompetitive effects in the market for ATM services in the Ohio–Kentucky–Pennsylvania region, and particularly in certain areas in Ohio." *Id.* at 4, *reprinted in* J.A. 636. In this regard, the Board noted that, "recently, ... local ATM networks have consolidated in an effort to enhance the value of their services to customers through the economies of ubiquity." *Id.* at 8, *reprinted in* J.A. 640. Accordingly, the Board concluded "that the appropriate geographic market area for MAC's product lines is a region composed of several states.... In light of National City's banking presence in Ohio, Indiana, and Kentucky, the appropriate geographic market in which to analyze the competitive effects of this proposal is MAC's Mideast region." *Id.* at 9, *reprinted in* J.A. 641.

The Board rejected the notion that the transaction would have anticompetitive effects in MAC's Mideast region. The Board concluded that, in light of the regional divisions within the ATM industry and evidence presented regarding NCC's operations, NCC's ATM network, MoneyCenter, was not in direct competition with EPS's MAC network, nor was it a potential future competitor. Further, according to the Board, the

consolidation of the MoneyCenter's network services with the MAC network would not significantly increase barriers to the entry of other ATM service providers, nor would it create an undue concentration of resources.

The Board bolstered its determination that the proposed transaction would not harm competition by referring to the restrictions set forth in the Consent Decree, noting that the rules developed under the decree "promote competition and access to the MAC network." *Id.* at 13, *reprinted in* J.A. 645. The Board also noted that DOJ's Antitrust Division had not protested the transaction, although it had the opportunity to do so.

As to the public benefits that could be expected from the transaction, the Board determined that the capital infusion EPS would receive from NCC would improve EPS's research and development capabilities, allow it to offer innovative products and services sooner, ensure the quality of the products being offered, and allow it to provide these products to a broad customer base.

The Board rejected MSI's request for an evidentiary hearing, noting that there were no disputed material facts to warrant such a hearing. The Board subsequently denied MSI's request for reconsideration of its Order, prompting this petition for review.

## II. DISCUSSION

### A. *The Bank Holding Company Act*

The BHC Act prohibits bank holding companies from "acquir[ing] direct or indirect ownership or control of any voting shares of any company which is not a bank" or "engag[ing] in any activities other than ... banking or of managing or controlling banks" or other services expressly permitted by the Board under section 4(c)(8) of the BHC Act. 12 U.S.C. § 1843(a) (1994). Section 4(c)(8) provides that a bank holding company shall not be prohibited from owning "shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident

ber dissented, stating that he believed that the transaction should be approved, but would have

conditioned approval on certain changes in MAC's operating rules.

thereto." *Id.* § 1843(c)(8). According to the statute,

> [i]n determining whether a particular activity is a proper incident to banking or managing or controlling banks *the Board shall consider whether its performance* by an affiliate of a holding company *can reasonably be expected to produce benefits to the public,* such as greater convenience, increased competition, or gains in efficiency, *that outweigh possible adverse effects,* such as undue concentration of resources, decreased or unfair competition, conflicts of interests, or unsound banking practices.

*Id.* (emphasis added).

Under 12 U.S.C. § 1848 (1994), when the Board is reviewing an application filed under the BHC Act, "[t]he findings of the Board as to the facts, if supported by substantial evidence, shall be conclusive." This standard has been described as a "specific application" of the "arbitrary and capricious" standard of review. *Association of Data Processing Serv. Orgs. v. Board of Governors,* 745 F.2d 677, 683 (D.C.Cir.1984).

## B. The Board's Approval of the EPS/NCC Applications

MSI petitions for review of the Board's Order on the grounds that the Board erred in its approval of the applications by improperly analyzing both the adverse effects and possible benefits of the transaction. MSI also asserts that, because substantial disputed issues of fact were presented to the Board, the Board was required to grant a hearing on the applications. I review each of these claims in turn.

### 1. The Board's Review of Adverse Effects

According to MSI, the Board improperly defined the geographic region affected by the transaction, failed to conduct a meaningful analysis of the transaction's effect on competition in the ATM industry, improperly assessed NCC's role as an existing competitor, and did not consider the impact the transaction would have on prospects for the entry of new competitors into the ATM network market. MSI also complains that the Board erroneously relied on findings made by DOJ instead of undertaking its own inquiry.

### a. The Geographic Region

As the Board indicated in its Statement, the Supreme Court has noted that the area in which the competitive effect of a merger between banks is to be assessed "is not where the parties to the merger do business or even where they compete, but where, within the area of competitive overlap, the effect of the merger on competition will be direct and immediate." *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, 357, 83 S.Ct. 1715, 1738, 10 L.Ed.2d 915 (1963). In defining the region in which to analyze the effect of the EPS/NCC transaction as MAC's Mideast region, the Board considered not only the record evidence about MAC's and NCC's operations, but also the documented industry trend toward regional ATM networks. *See* Statement at 7–9, *reprinted in* J.A. 639–41. I can find no basis upon which to overturn this judgment.[5]

### b. Analysis of the Effect of the Transaction on Competitive Conditions

Likewise, I find that substantial evidence supports the Board's finding that the proposed transaction is not likely to have an adverse effect on the ATM network market in MAC's Mideast region. The relevant question is whether the proposed transaction will result in a significant decrease in competition in that market. At the time of the Board's decision, NCC's MoneyCenter network, unlike MAC, generally provided ATM-related services only to banks that were NCC subsidiaries.[6] Further, NCC had tak-

---

**5.** The Board's definition of the relevant product markets as network access, network switching, and ATM processing services has not been contested.

**6.** As of October 1994, while the EPS and NCC applications were pending, NCC was providing branded network access and services "only to its affiliated banks." Letter from Barbara R. Lowrey, Associate Secretary of the Board, to A. Edward Gough, President, Money Station, Inc. 2 (Mar. 31, 1995) ("Denial of Reconsideration"), *reprinted in* J.A. 677, 678. Before that time, the Board found that NCC "engaged in some activities in the network services and ATM processing

en no steps toward competing with EPS and other ATM service providers in the general marketplace. In fact, NCC had shunned the possibility of entry into that market, as evidenced by its divestiture of such business on the few occasions when it could have made its entrance.[7] Thus, given that NCC was not, and gave no indication that it would ever be, a direct competitor of EPS, the Board did not err in finding that the proposed transaction would not adversely affect the relevant ATM market. (There are no other complaining entities claiming to be potential competitors of EPS in the relevant market.)

MSI also claims that the elimination of the MoneyCenter network raises barriers to entry into the ATM market. The Board's Statement acknowledges the industry's movement toward larger networks; however, this trend is neither surprising nor of any great moment. The Board properly determined that the ATM industry is moving toward regional and national networks, and that the existence of a primary network in each region is not a significant danger to nascent competition. *See Citicorp v. Board of Governors*, 589 F.2d 1182, 1191 (2d Cir.) (In enacting the BHC Act, Congress did not "condemn[ ] bigness as bad per se, . . . [but] did commit to the expertise of the Board the task of determining when size alone makes the combination of banking and nonbanking corporations against the public interest."), *cert. denied*, 442 U.S. 929, 99 S.Ct. 2860, 61 L.Ed.2d 297 (1979); *Alabama Ass'n of Ins. Agents v. Board of Governors*, 533 F.2d 224, 251 (5th Cir.1976) ("[T]he determination of what is 'undue' concentration of resources

was primarily committed to the Board by Congress."), *modified on other grounds*, 558 F.2d 729 (5th Cir.1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978).

MSI frets that the expansion of the MAC network after the EPS/NCC combination could lead to a variety of unfair business practices not unlike those that sparked DOJ's earlier investigation of EPS. However, as the Board observed, the Consent Decree will remain in effect until 2004 to check the application of the MAC system's operating rules. The Board also undertook its own review of the MAC system's rules based on comments requested from EPS and MSI regarding potential modifications that might be appropriate in light of the proposed EPS/NCC transaction. *See* Letter from Stephen A. Rhoades, Board Assistant Director, Division of Research and Statistics, to Allen Raiken, Esq., et al. (Feb. 15, 1995), *reprinted in* J.A. 579–81. After considering the comments of both EPS and MSI, the Board ultimately found it unnecessary to condition approval of the transaction upon changes in MAC's operating rules.

The Board also found that the relationship between MSI and the MAC network made it improbable that the transaction would unfairly jeopardize MSI's market position, because an existing contract permitting MSI's cardholders to use the MAC network suggests that MSI is not immediately harmed if MoneyCenter ATMs are affiliated with the MAC network. In fact, MoneyCenter ATMs already were part of the MAC network before EPS's acquisition of MoneyCenter, making it

product markets," such as the provision of services to 50 Indiana credit unions. *Id.* However, the Board found the provision of such services "limited" and too insignificant to constitute competition with EPS's regional network. *Id.* at 3, *reprinted in* J.A. 679.

**7.** For example, in 1984, NCC acquired a bank holding company that provided ATM processing services for third parties; by 1989, NCC had sold off the processing business. Later, in 1992, NCC acquired an Indiana bank that operated an ATM network and provided ATM servicing to third parties. NCC could have chosen to pursue third-party ATM processing business by developing the acquired bank's customer base. Instead, NCC did not solicit new processing business after 1993, did not advertise the network, and allowed

customers to leave. Although NCC and other Midwest financial institutions participated in an aborted attempt to form a new regional ATM network in the early 1990s, that effort ended in 1993, and NCC made no effort to expand its own ATM services thereafter. Thus, NCC's behavior is unlike that which would be expected of a potential competitor in the ATM services market. *Cf. FTC v. Procter & Gamble Co.*, 386 U.S. 568, 580, 87 S.Ct. 1224, 1231, 18 L.Ed.2d 303 (1967) (Evidence supported the agency's finding that Procter & Gamble was a potential competitor in the liquid bleach market because Procter & Gamble had recently issued a similar product, was vigorously diversifying its product lines, and had significant experience and resources devoted to the marketing of similar products.).

unlikely that MSI will be adversely affected by the change. Finally, the fact that NCC is an equity owner of MSI (and MSI's ATM network, Money Station) renders it unlikely that NCC would choose to harm its own interests by engaging in predatory behavior directed against MSI.[8] Thus, I would concur with the Board's rejection of MSI's various arguments suggesting that the transaction could result in an unfair allegiance, or some sort of proscribed anticompetitive vertical integration, between NCC and the MAC network.

MSI presented evidence to the Board that a Kentucky ATM network, Quest, had folded in the wake of EPS's acquisition of the MoneyCenter ATM network, and tried to convince the Board that statistics regarding MAC's ownership of a significant share of ATM machines in Kentucky, Ohio, and Pennsylvania proved that the transaction would have an anticompetitive effect. But, contrary to MSI's assertion that the Board ignored this evidence, it appears that the Board considered the evidence and determined that quantitative analysis of ATM machines was not the appropriate course. *See* Statement at 11 n. 29, *reprinted in* J.A. 643. There is no basis to disturb the Board's determination on this point. It is apparent that the ATM industry has been moving toward larger networks and that there have been some business casualties along the way. However, MSI cannot invoke judicial review as a means of protecting itself from the effects of a market where customers have freely opted to use the MAC network instead of Money Station. Similarly, to the extent that EPS may have the ability to charge monopoly rents for use of the MAC network, such power is not likely to be the result of the combination of EPS and NCC; instead, such power appears to have developed over time in the ATM network market. In my opinion, it is not a matter that can find redress in this proceeding.

### c. The Board's Reference to DOJ's Review

MSI's charge that the Board relied on DOJ's decision not to challenge the applica-

tions of EPS and NCC in lieu of making its own reasoned judgment about the transaction also should be rejected. The Board's reference to DOJ's review of the proposed transaction as an additional argument in favor of its approval cannot be read to form the only, or even a significant, basis for its decision. *See* Statement at 15–16, *reprinted in* J.A. 647–48. While the Board's action might have been questionable had it chosen to rely primarily on DOJ's determinations without its own independent review, there is no indication in this case that the Board shirked its responsibility. Furthermore, it is hardly irrelevant that DOJ found no reason to submit objections to the proposed transaction. Had the opposite occurred, I have no doubt that MSI would have brought it to the court's attention.

### 2. The Board's Review of Public Benefits

Under the BHC Act, the Board is responsible for assessing the anticipated public benefits of a proposed transaction, and for balancing their potential effect against the evils that might result from the transaction. *See* 12 U.S.C. § 1843(c)(8) (1994). This court has previously noted that "the Board's reasoned judgments" in this regard "are entitled to some deference in view of its considerable expertise and experience in administering the [BHC] Act." *Connecticut Bankers Ass'n v. Board of Governors,* 627 F.2d 245, 254 (D.C.Cir.1980); *see also Alabama Ass'n of Ins. Agents,* 533 F.2d at 246 (Because of the reasonable-expectation standard set forth in 12 U.S.C. § 1843(c)(8), "reasons for deference to the Board's reasoned judgment ... are magnified in the context of the 'public benefits' determination.").

MSI alleges that the Board erred in determining that public benefits resulting from EPS's increased ability to continue and expand its development of new electronic banking products outweighed the possible adverse effects of elimination of NCC as a competitor. According to MSI, instead of making the required reasoned evaluation of the as-

---

**8.** It also appears that two other owners of EPS are MSI owners. *See* MSI Comment at 21, *reprinted in* J.A. 208 (As of September 1994, MSI's owners included NCC, KeyCorp, and a corporation owned and controlled by PNC Financial Corp.).

serted public benefit, the Board engaged in conjecture when it found that "enhanced research and development capabilities generated by [the NCC] investments should improve EPS's ability to introduce these products sooner, to ensure the quality of the products being offered, and to present the products to a broad customer base." Statement at 21, *reprinted in* J.A. 653. MSI argues that the "novel" products are already available, and thus, there is no benefit to be had from the alleged enhancement of EPS's development and marketing capabilities. MSI also asserts that there was no substantial evidence showing that the capital EPS received from the transaction would actually be allocated to product development.

Even, assuming, *arguendo,* that MSI is correct in suggesting that the "public benefits" from the proposed transaction are only minimal, this would not carry the day. Rather, the significant point in this case is the Board's finding that the proposed transaction presented little or no likelihood of adverse effects. In such a circumstance, it does not matter that the perceived public benefit is small. As the court noted in *American Land Title Ass'n v. Board of Governors,* 892 F.2d 1059 (D.C.Cir.1989), in applying 12 U.S.C. § 1843(c)(8),

> [t]he Board [may] consider[ ] the *possible* adverse effects of the acquisition ... but then decide[ ] to give those possible adverse effects relatively little weight in the benefits-adverse effects balance concluding that the possible adverse effects were unlikely to actually occur.

*Id.* at 1066. And it does not matter that the Board's order "approach[es] the outer boundary of tolerably terse," so long as it reflects a "reasoned judgment[ ]." *Id.* at 1065. In any event, one need not agonize over such concerns in this case, for the Board's consideration of the benefits of the EPS/NCC transaction was sufficient, and its findings were supported by substantial evidence.

In their applications, the owners of EPS noted that the transaction would result in more efficient service to customers and would enable EPS to direct more resources to research and development. *See e.g.,* KeyCorp Application at 36, *reprinted in* J.A. 51.

This claim was further supported by additional information, submitted at the Board's request, that discussed the enhanced services EPS hoped to develop and offer to an expanded market after the transaction. *See* Letter from Allen L. Raiken, Counsel to EPS, to James V. DiSalvo, Senior Banking Structure Analyst, Federal Reserve Bank of Philadelphia (Oct. 31, 1994) 14–20, *reprinted in* J.A. 383, 396–402. As this material and the Board's Statement make clear, several public benefits were seen to flow from the transaction: the infusion of capital would help EPS fund research and development; and the transaction would also lead to economies in MAC's operations, the effect of which (in combination with the expanded MAC network) would lead to improved development and marketing of innovative banking products. Thus, even though EPS planned to use at least part of the cash received from NCC to reduce debts and "for general working capital purposes," KeyCorp Application at 50, *reprinted in* J.A. 65, and even though, as the Board acknowledged, some of the products EPS hoped to improve after the transaction were already available to some extent, the Board did not err in finding that the enhancement of EPS's ability to develop and promote new products was a public benefit that outweighed the negligible adverse effects from the EPS/NCC transaction. In short, when the Board weighed *something* (the cited public benefits) against virtually *nothing* (the negligible adverse effects), it was clear that there was no good reason to reject the proposed transaction.

The majority relies on *Chase Manhattan Corp.,* 60 Fed.Res.Bull. 142 (1974), to suggest that, because EPS might have pursued research and development of innovative banking products without approval of the NCC transaction, the Board erred in finding that some public benefit would be derived from the transaction. But the Board's 20–year–old order in *Chase Manhattan* hardly seems apposite in light of the Board's recent decision involving current ATM technology in *Bank of New York Co.,* 80 Fed.Res.Bull. 1107 (1994), in which the Board approved the application of several large commercial banking organizations to form a joint venture provid-

ing ATM services despite the resulting loss of an independent ATM network. The Board noted that the public benefits from the transaction would include just what EPS hopes to achieve here: reduction of costs due to increased transaction volume and economies of scale, improved service and convenience for customers, and more efficient introduction of additional products. *See id.* at 1110.

### 3. *The Board's Denial of MSI's Hearing Request*

Under the Board's regulations, an evidentiary hearing is required only "if there are disputed issues of material fact that cannot be resolved in some other manner." 12 C.F.R. § 225.23(g) (1994); *see also Connecticut Bankers Ass'n,* 627 F.2d at 251 (While a " 'petitioner need not make detailed factual allegations' .... a protest[er] does not become entitled to an evidentiary hearing merely on request, or on a bald or conclusory allegation that [a dispute of material fact] exists." (quoting *Independent Bankers Ass'n of Georgia v. Board of Governors,* 516 F.2d 1206, 1220 n. 57 (D.C.Cir.1975))). In this case, there is no basis to disturb the Board's determination that the record was amply developed and no dispute of material fact remained.

As this court has noted, the Board cannot be required to "investigate every potential adverse contingency which a contestant hypothesizes." *Id.* at 254; *see also Independent Bankers,* 516 F.2d at 1220 (The court found that the Board "carries a heavy burden of justification" when denying a hearing, but noted that a hearing is not necessary when no material facts are disputed.). Although MSI couches its complaints as a dispute about the facts, I agree with the Board that MSI actually "disputes the weight accorded to, and the conclusions that may be drawn from, all the facts of record, and does not identify disputed issues of fact that are material to the Board's decision." Statement at 23–24, *reprinted in* J.A. 655–56. It is indisputably within the Board's discretion to deny an evidentiary hearing in a case such as this.

The extraordinary nature of the remedy the court has granted to MSI is highlighted by Board counsel's statement that, according to his recollection, since 1980, only two or three hearings regarding section 4(c)(8) issues have been conducted. Tr. of Oral Argument at 23. Even the decision upon which the majority relies, *American Bancorporation, Inc. v. Board of Governors,* 509 F.2d 29 (8th Cir.1974), does not call for the resolution which the majority affords here, because that case involved a transaction that "would move bank holding companies into an uncharted field" fraught with possibilities for conflict of interest. *Id.* at 38–39. As the court noted,

> [w]e do not suggest by this opinion that any list of unanswered factual issues will unlock the door to a trial-type hearing. Congress ... intended to reduce the volume of formal hearings in a burgeoning field in an effort not to overtax the supervisory capabilities of the Board. Informal supervision has characterized regulation in the banking industry, and should be encouraged.

*Id.* at 39 (citation omitted). There is no case upon which the majority can rely that would compel the Board to grant MSI a hearing where both the Board and DOJ have considered and rejected the potential adverse effects of the transaction. The decision to grant a hearing under such circumstances is wholly within the Board's discretion, and, in my judgment, the majority's decision to overrule the Board will result in nothing more than a waste of the time and resources of the Board and the parties. Accordingly, I dissent.